UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Robert H. Boudreau,
        Plaintiff

        v.                                    Civil No. 09-cv-247-SM
                                              Opinion No. 2009 DNH 192
Celia Englander, M.D.,
Bernadette Campbell, P.T.,
John Eppolito, M.D., and
Robert MacLeod, M.D.
        Defendants


**O R D E R**


        Robert Boudreau is serving a criminal sentence in the New
Hampshire State Prison system and is currently housed at the
Northern New Hampshire Correctional Facility.  In this suit,
Boudreau seeks compensatory and punitive damages, as well as
declaratory and injunctive relief, claiming defendants violated
his Eighth Amendment right to be free from cruel and unusual
punishment when they altered the prescription medications he had
been receiving to treat chronic back pain.  See generally 42
U.S.C. § 1983.  He also advances various state law claims for
negligence, medical malpractice, and intentional infliction of
emotional distress.


        Following a two-day evidentiary hearing, the Magistrate
Judge issued a Report and Recommendation, in which he concluded
that Boudreau was likely to prevail on his Eighth Amendment

claims and recommended that the court grant his application for a preliminary injunction.  Report and Recommendation (document no. 43).  Defendants filed timely objections in which they urge the court to reject the Report and Recommendation and deny Boudreau's motion for preliminary injunctive relief.  See generally 28 U.S.C. § 636(b)(1)(C).  See also Fed. R. Civ. P. 72(b).

As explained more fully below, preliminary injunctive relief depends in significant part on Boudreau's establishing that he is likely to succeed on the merits of his Eighth Amendment claim. To succeed on that claim Boudreau will have to persuade a finder of fact, by a preponderance of the evidence, that the medical care provided at the New Hampshire State Prison by the named physicians was so substandard as to constitute "deliberate indifference" to his serious medical needs.

Having carefully reviewed the record, including the transcript of the hearing held before the Magistrate Judge, it is apparent that Boudreau's Eighth Amendment claim does not rest upon facts from which a reasonable fact-finder could, or will likely, conclude that the treating physicians acted with deliberate indifference, at least not in the absence of expert medical opinion evidence.  That is, this is not a case in which it is plausibly alleged that doctors, being aware of a serious

medical necessity and attendant suffering, nevertheless did nothing, knowing that failure to intervene would continue and exacerbate that suffering, or result in permanent damage.

Rather, this is a case in which Boudreau's medical condition, concededly serious chronic back pain, complicated by the comparatively high doses of opioids he was taking, was seemingly amenable to varying medical treatment strategies. Different treatment alternatives involve different potential benefits and risks that must be weighed and, in the end, professional medical judgment must be exercised in deciding upon an appropriate treatment plan.  The hearing transcript discloses strong disagreement about the proper (or perhaps only the preferable) medical strategy that should have been pursued with respect to Boudreau's pain management.  But, Boudreau is not medically trained, nor is his legal counsel, nor is this court, and Boudreau presented no expert medical evidence to contradict that introduced by the defendants.

The medical care provided Boudreau to address his chronic back pain may have been perfectly reasonable and well within appropriate professional norms, or it may have been plainly substandard.  Perhaps it was so substandard that it rose to the level of deliberate indifference for Eighth Amendment purposes.

This factual record leaves the question open, however, and it is inadequate to support a finding that Boudreau is likely to establish "deliberate indifference" at trial.  Indeed, as currently developed, the record is inadequate to support a finding that he is likely to establish even medical negligence at trial.

Because Boudreau failed, as a matter of law, to demonstrate that he is likely to prevail on the merits of either his Eighth Amendment claim or any of his state common law claims, the court cannot approve the Report and Recommendation.  Boudreau's motion for preliminary injunctive relief is denied, as explained below.

## Standard of Review

Pursuant to 28 U.S.C. §636(b)(1), the court reviews de novo those portions of the report and recommendation to which a party has filed a timely objection.

The Supreme Court has observed that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, at 129-30 (2d ed.

1995)) (emphasis in original).  Consequently, as the party
seeking preliminary injunctive relief, Boudreau bears a heavy
burden and must establish each of the following: (1) that he is
likely to succeed on the merits of his claims; (2) that he will
likely suffer irreparable harm in the absence of an injunction;
(3) that issuance of the requested injunction would burden the
defendants less than denying an injunction would burden Boudreau;
and (4) that issuance of an injunction is consistent with (or at
least not contrary to) the public interest.  See, e.g., Waldron
v. George Weston Bakeries, Inc., 570 F.3d 5, 9 (1st Cir. 2009);
Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 11
(1st Cir. 2008).  "The sine qua non of this four-part inquiry is
likelihood of success on the merits: if the moving party cannot
demonstrate that he is likely to succeed in his quest, the
remaining factors become matters of idle curiosity."  New Comm
Wireless Serv. v. Sprintcom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)
(citing Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993)).


## Discussion

I.   The Eighth Amendment and Prison Medical Care.

     To prevail on his Eighth Amendment claim for medical
mistreatment, Boudreau must show that prison officials
demonstrated "deliberate indifference to [his] serious medical
needs."  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  This test

5

has both objective and subjective (state-of-mind) aspects.  <u>See</u>
<u>DesRosiers v. Moran</u>, 949 F.2d 15, 18 (1st Cir. 1991).

    As the Supreme Court has noted, the Constitution "does not
mandate comfortable prisons, and only those deprivations denying
the minimal civilized measure of life's necessities are
sufficiently grave to form the basis of an Eighth Amendment
violation."  <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991) (citation
and internal quotation marks omitted).  Consequently, under the
objective aspect of the deliberate indifference test, Boudreau
must show that he has suffered a serious deprivation of a
fundamental right or basic human need.  <u>See DesRosiers</u>, 949 F.2d
at 18.  And, under the subjective aspect, he must demonstrate
that defendants were aware of, yet consciously chose to
disregard, a substantial risk of serious harm to him.  <u>See Farmer</u>
<u>v. Brennan</u>, 511 U.S. 825, 837 (1994) ("[A] prison official cannot
be found liable under the Eighth Amendment for denying an inmate
humane conditions of confinement unless the official knows of and
disregards an excessive risk to inmate health or safety; the
official must both be aware of facts from which the inference
could be drawn that a substantial risk of serious harm exists,
and he must also draw the inference.").

An Eighth Amendment medical mistreatment claim, then, cannot be premised upon a theory of simple negligence or even a clear case of medical malpractice.  Rather, to support an Eighth Amendment claim, a medical care provider's conduct must go beyond negligence in diagnosing or treating a prisoner's medical condition.  See Estelle, 429 U.S. at 105-06.  Similarly, a constitutional violation does not occur merely because a prisoner disagrees with a nurse's or physician's decision regarding the proper course of medical treatment.  See, e.g., Ruiz-Rosa v. Rullan, 485 F.3d 150, 156 (1st Cir. 2007) ("[S]ubstandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation."); Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993) ("The courts have consistently refused to create constitutional claims out of disagreements between prisoners and doctors about the proper course of a prisoner's medical treatment, or to conclude that simple medical malpractice rises to the level of cruel and unusual punishment.").  Instead, to violate the Eighth Amendment, the "care provided must have been so inadequate as to shock the conscience," Feeney v. Corr. Med. Servs., 464 F.3d 158, 162 (1st Cir. 2006) (citations and internal punctuation omitted), or it must "constitute an unnecessary and wanton infliction of pain or

be repugnant to the conscience of mankind," Estelle, 429 U.S. at
105–06 (citations and internal punctuation omitted).

II.  Defendants' Treatment of Boudreau.

    The relevant facts, largely undisputed, are set forth in
detail in defendants' memoranda and the Magistrate Judge's Report
and Recommendation.  Accordingly, they need not be recounted in
detail.  Those facts necessary to the disposition of this matter
are discussed as appropriate.

    Before his most recent incarceration, Boudreau injured his
back and suffered three ruptured or herniated disks.  He
underwent surgical procedures in 2000 and 2002.  And, in 2006, he
had a third surgery while incarcerated, after which he was
advised that additional surgeries were not recommended.  He was
encouraged to manage his continuing pain medically, and through
the use of a T.E.N.S. unit (a battery–operated device that
transmits electrical impulses to block nerve pain signals to the
brain).  Since approximately 2004 or 2005, prison medical
professionals have prescribed narcotics to manage Boudreau's
pain.  Immediately prior to filing this lawsuit, Boudreau was
taking 210 mg of MS Contin per day, up from the 180 mg per day he
had been receiving at the end of 2008.

MS Contin is a "controlled-release oral formulation of morphine sulfate indicated for the management of moderate to severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time."  Physicians' Desk Reference ("PDR") at 2586 (63rd ed. 2009).  The PDR cautions that "MS Contin 100 and 200 mg tablet strengths are high dose, controlled-release, oral morphine formulations indicated for the relief of pain in opioid-tolerant patients only." Id.  It goes on to warn that, "[t]his strength is potentially fatal if accidentally ingested and patients and their families should be instructed to take special care to avoid accidental or intentional ingestion by individuals other than those for whom the medication was originally prescribed." Id.

Defendant, Dr. Celia Englander, is the Chief Medical Officer for the New Hampshire Department of Corrections ("DOC"), and was one of Boudreau's treating physicians during his incarceration. In January of 2008, Dr. Englander wrote in a progress note that DOC medical staff should consider tapering Boudreau's prescription for MS Contin.  Transcript, Day 1 afternoon, at page 37, line 15.  Later, in October of 2008, Boudreau filed an inmate request slip in which he reported that he was "in constant pain lately [and] the medication alone isn't enough to quell the pain I'm in."  Defendants' Exhibit U.  Dr. Englander responded, saying

she had reviewed his most recent MRI and it "looked great."  Id.
She also stated that "I see no indication for [additional]
narcotics."  Id.  Subsequently, Dr. Englander sought to have
Boudreau evaluated at the Dartmouth-Hitchcock Medical Center's
Pain Management Center.  On the form she submitted requesting
that evaluation, Dr. Englander wrote that Boudreau was receiving
210 mg of MS Contin each day and was seeking an increase in that
medication, but his symptoms appeared disproportionate to
objective findings on an MRI.  Transcript, Day 1 afternoon, page
45.  Plainly, then, as early as January of 2008 and into 2009,
Dr. Englander was concerned about the high levels of MS Contin
Boudreau was taking, and had given thought to tapering him off
that medication.[1]  See, e.g., Transcript, Day 1 afternoon, at 48.
See also Defendants' Exhibit U.

In approximately June of 2009, Dr. Eppolito began seeing
patients at the DOC in anticipation of establishing a pain

---

[1]      Medical witnesses testified that patients receiving
opiates for an extended period of time can develop a tolerance
for those medications and, therefore, require increasingly larger
dosages to obtain the same pain-management benefit.  Eventually,
some patients reach dosage levels at or near the therapeutic
limit – that is, the dosage they need to obtain relief from pain
approaches the level at which the drug can cause serious side-
effects and/or death.  Accordingly, it is often advisable for
such patients to "taper" their dosage down, allow their bodies to
adapt to that lower dosage, and then increase the dosage as
necessary to obtain more effective relief.  Dr. Eppolito referred
to this tapering as taking a drug "holiday."

management clinic for inmates.  Transcript, Day 1 afternoon, at
57.  He testified that the first patients he saw were the 30 or
so inmates receiving prescription morphine derivatives for pain
management.  He met with Boudreau on June 30, 2009.  A
confrontational exchange developed, the details of which are
disclosed in the transcript.  It is sufficient to note that Dr.
Eppolito was concerned that Boudreau's daily prescription for 210
mg of MS Contin was dangerously high and risked potentially
severe side effects.  He was also concerned that, in light of
Boudreau's October, 2008, inmate request slip (in which he stated
that his pain was not well-managed on his current dosage of MS
Contin), steps needed to be taken to address Boudreau's
increasing tolerance to opiates.  So, apparently sharing some of
the same concerns expressed by Dr. Englander, Dr. Eppolito
concluded that it might be appropriate to taper Boudreau's
prescription for MS Contin or, as he put it, to have Boudreau
take an opiate "holiday."

Importantly, however, before ordering any tapering of
Boudreau's prescription for MS Contin, Dr. Eppolito first
consulted with other medical providers, including experts in pain
management.  To that end, Dr. Eppolito testified that he spoke
with: (1) Dr. John Richman, another doctor working at the
Department of Corrections, who stated that Boudreau's aggressive,

11

angry, threatening conduct at the June 30 meeting was suggestive of drug-seeking behavior (Transcript, Day 1 afternoon, at page 109, lines 21-23); (2) Chris Clough, a certified physician assistant at a pain management clinic in Somersworth, New Hampshire, who said a drug holiday would be "a reasonable idea at this time" (id. at page 109, lines 1-4); (3) Dr. Ross Jenkins at the New Hampshire NeuroSpine Institute (the neurosurgeon who performed Boudreau's most recent surgery), who stated that a "narcotic taper would be appropriate if patient was still having pain on his current dose." (id. at page 102, lines 8-11); and (4) Dr. Ralph Beasley at the Dartmouth-Hitchcock Medical Center's Pain Management Center, who opined that Boudreau's large daily dosage of morphine would likely cause problems with his immune system and endocrine system, and stated that it would be appropriate to taper his MS Contin prescription (id. at page 106). Dr. Beasley's notes from his telephone conversation with Dr. Eppolito provide as follows:

> Phone discussion with Doctor from State Prison.
> Patient reporting morphine not helping anymore and
> needs more morphine. Patient coming soon for medial
> branch blocks. On Effexor now.
>
> Advised that 200 mg of morphine is our relative upper
> limit for treatment of chronic non-malignant pain and
> at that level you start seeing more immunologic
> suppression and effect on hormones such as
> Testosterone, etc. Suggested not to increase dose
> further and since morphine is not helping, it may be
> worth weaning off of an ineffective medication as it
> appears opioids are not effective for controlling his

12

<u>pain, and there is no need to give an ineffective drug
with significant side effects</u>.

Defendants' Exhibit D (emphasis supplied).


Dr. Eppolito concluded that it was appropriate to taper
Boudreau's MS Contin.  But, as part of that process, several
other medications were prescribed, both to help manage Boudreau's
pain and to help him sleep.  Boudreau himself testified that he
was given Motrin, Mobic, Prednisone, Benadryl, and Neurontin, as
well as a T.E.N.S. unit.  Transcript, Day 1 morning, pages 45-49.
He was also given Effexor.  Transcript, Day 1 afternoon, page 49,
line 1.  Additionally, Boudreau was offered, but refused,
Trazodone (Transcript, Day 1 morning, page 48, lines 10-12) and a
nerve block surgical procedure (<u>Id</u>. at page 54, lines 9-13).


III. <u>The Report and Recommendation</u>.

In his report and recommendation, the Magistrate Judge
concluded that "Dr. Eppolito failed to adequately treat
Boudreau's serious medical condition" and "acted with deliberate
indifference to Boudreau's pain."  Report and Recommendation at
43.  After careful review, I find the record support for those
factual and legal conclusions incomplete, particularly in one
dispositive respect.

13

As noted above, to demonstrate that one or more defendants were deliberately indifferent to his serious medical needs, Boudreau is obligated to show more than mere negligence or even medical malpractice.  He has not, as a matter of law, met even the lower standard.  As the record stands, Dr. Eppolito's unrebutted testimony is that, after consulting with at least four other medical providers, he determined, as a licensed medical professional, that Boudreau's narcotic dosage should be tapered. Each medical professional he consulted concurred that tapering was an appropriate treatment response to Boudreau's condition. And, there was substantial testimony concerning the various medications that were prescribed during that taper to help alleviate Boudreau's pain.

For his part, and this is critical, Boudreau did not offer any expert medical opinion evidence tending to question or contradict Dr. Eppolito's professional treatment decisions. Instead, he merely produced evidence tending to show that he continued to suffer pain, notwithstanding the treatment provided, that his pain was not well-managed during the taper, or might have been better managed, or, in his opinion, managed differently.  Boudreau also presented evidence showing that he refused to take some of the recommended medications (allegedly due to his concerns about potential adverse side-effects), while

14

those medications he did take did not adequately address his pain.  He also refused an offered nerve block procedure (again, apparently due to personal concerns about potential side effects).  It may be, as alleged, that defendants' professional efforts to manage Boudreau's pain during the tapering period were not a model of first-rate pain management care.  It may also be that the initial decision to taper Boudreau off MS Contin was itself not the best medical approach under the circumstances. The Magistrate Judge reached that very conclusion, finding that "Dr. Eppolito jumped the gun in reducing Boudreau's medication" before a comprehensive pain management plan had been developed and implemented by the pain management clinic team.  Report and Recommendation at 47.  There is, however, no medical evidence in the record suggesting that a "pain management plan" must be developed and implemented by a "pain management clinic team" before medical treatment decisions can be properly implemented by a qualified physician, and there is little evidence suggesting some untoward motivation behind Dr. Eppolito's medical judgment (the Magistrate Judge rejected, for example, an implication that budgetary problems were driving medical treatment decision).

    This court lacks the medical training and expertise necessary to determine, in the absence of expert opinion evidence, whether the medical judgment exercised by the defendant

physicians fell below an acceptable standard of professional
care, much less that the medical care provided to Boudreau was so
substandard as to implicate the Eighth Amendment.  Stated
slightly differently, the medical care Boudreau did receive was
not so obviously and shockingly deficient that the court can
conclude, without the benefit of supporting expert medical
testimony, that Boudreau is likely to prevail on his Eighth
Amendment, or even his common-law tort, claims.  Absent credible
expert medical evidence to support Boudreau's position, the
evidence he did introduce at the hearing – particularly when
considered in light of the evidence produced by defendants – is
simply too weak to support even a suggestion that Dr. Eppolito
was "deliberately indifferent" to his serious medical needs, or
that the medical care Boudreau received was "repugnant to the
conscience of mankind."  Estelle, 429 U.S. at 106.  See also
Feeney, 464 F.3d at 162 (noting that "'deliberate indifference'
defines a narrow band of conduct in this setting" and substandard
medical treatment, "even to the point of malpractice, is not the
issue").

    If Boudreau expects to prevail at trial on his
constitutional and/or state tort claims in this case, he will
need to present expert medical witness testimony.  At the very
least, Boudreau will be required to show that the medical care he

16

received fell below the standard of reasonable medical practice.
As the record currently stands, however, the following facts are
undisputed:

1.   In October of 2008, Boudreau reported that
     his then-current dosage of MS Contin was not
     adequately managing his pain;

2.   210 mg of MS Contin daily is at the upper end
     of the therapeutic limit, and higher levels
     pose a substantial risk of serious physical
     and behavioral side-effects;

3.   Given Boudreau's situation, the medical
     decision to taper his daily intake of MS
     Contin was not obviously medically
     inappropriate;

4.   During the tapering period, Boudreau was not
     ignored, but was prescribed numerous
     medications to help manage his pain (some of
     which he took, others he refused); and

5.   Defendants provided Boudreau with a T.E.N.S.
     unit, and offered a surgical nerve block to
     alleviate his pain, which he refused.

    Given those undisputed facts, and the uncontradicted medical
testimony presented, the court cannot conclude that Boudreau is
likely to prevail on his Eighth Amendment claim that defendants
subjected him to cruel and unusual punishment by demonstrating
deliberate indifference to his serious medical needs.

    Finally, although not directly addressed in the Report and
Recommendation, given the absence of any expert medical evidence
supportive of Boudreau's claims, this record also cannot support

a legal conclusion that he is likely to prevail on his state common law negligence or medical malpractice claims.  <u>See</u> N.H. Rev. Stat. Ann. ch. 507-E (requiring, in any case seeking compensation for medical injury, expert medical testimony: (1) as to the standard of reasonable medical practice in the particular field or specialty at issue; (2) that the medical care provider failed to act in accordance with that standard; and (3) that, as a proximate result, the plaintiff suffered injuries).  <u>See also Smith v. HCA Health Servs. of N.H.</u>, 159 N.H. 158, ___, 977 A.2d 534, 538  (2009) ("The legislature enacted this statutory scheme to contain the costs associated with medical malpractice suits by elevating the evidentiary burden on plaintiffs, and by covering all conceivable lawsuits against medical care providers.  The plaintiffs' causes of action are plainly within the universe of claims the legislature intended to cover.") (citations and internal punctuation omitted).

### Conclusion

No one seems to doubt that Boudreau does suffer from chronic pain.  Nevertheless, the fact that he was in pain during the tapering period – even substantial pain – does not, standing alone, suffice to demonstrate that any defendant was "deliberately indifferent" to his serious medical needs.  As the Supreme Court has observed, even "prison officials who actually

knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." <u>Farmer v. Brennan</u>, 511 U.S. at 844. At this point, there is no evidence of record sufficient to establish that any of the defendants failed to act in a medically reasonable manner in either: (1) making the initial decision to taper Boudreau's MS Contin; or (2) attempting to manage his pain during that "tapering" period with alternative medical therapies.

For the foregoing reasons, the court must decline to accept the Report and Recommendation (document no. 43). Plaintiff's motion for temporary restraining order and preliminary injunction (document no. 2) is, therefore, denied, for failure to establish, as a matter of law, the critical "likelihood of success on the merits" element necessary to issuance of preliminary injunctive relief.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

December 14, 2009

cc:  Michael J. Sheehan, Esq.
     Edward M. Kaplan, Esq.
     Martin P. Honigberg, Esq.
     Laura E. B. Lombardi, Esq.

19